| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA<br>v. | Docket No. |
| ROSHAUN NAKIA PORTER | MAGISTRATE'S CASE NO. **SA12-148M** |

Complaint for a violation of Title 18, United States Code, Section 1589

| NAME OF MAGISTRATE JUDGE<br>JEAN P. ROSENBLUTH | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Santa Ana, CA |
|---|---|---|
| DATE OF OFFENSE<br>Beginning on a date unknown and continuing until on or about April 6, 2012 | PLACE OF OFFENSE<br>Orange County | Address of ACCUSED (IF KNOWN)<br>FILED SOUTHERN DIVISION<br>CLERK, U.S. DISTRICT COURT<br>APR 1 0 2012<br>CENTRAL DISTRICT OF CALIFORNIA<br>BY DEPUTY |

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

Beginning on a date unknown and continuing until on or about April 6, 2012, in Orange County, within the Central District of California, and elsewhere, defendant ROSHAUN NAKIA PORTER, also known as "Kevin," knowingly provided and obtained the labor and services of JD1, JD2, JD3, JD4, and JD5, by means of force, threats of force, physical restraint, or threats of physical restraint to JD1, JD2, JD3, JD4, JD5 or another person, and by means of serious harm or threats of serious harm to JD1, JD2, JD3, JD4, JD5 or another person, and by means of any scheme, plan, or pattern intended to cause JD1, JD2, JD3, JD4, and JD5 to believe that, if JD1, JD2, JD3, JD4, and JD5 did not perform such labor or services, JD1, JD2, JD3, JD4, JD5 or another person would suffer serious harm or physical restraint.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:
(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT |
|---|---|
| | Agent's Name and Department<br>TRICIA WHITEHILL<br>SPECIAL AGENT<br>FEDERAL BUREAU OF INVESTIGATION |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1)<br>**JEAN P. ROSENBLUTH** | DATE<br>4-10-12 |
|---|---|

1) See Federal Rules of Criminal Procedure rules 3 and 54.
AUSA: SNL

# AFFIDAVIT

I, Tricia Whitehill, being duly sworn, do hereby depose and say:

## I. INTRODUCTION

1. I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"). I have been a Special Agent with the FBI since November 2005. Since April 2006, I have been assigned to the Los Angeles Field Office, Civil Rights Squad. In that capacity, I am responsible for investigating human trafficking.

## II. PURPOSE OF AFFIDAVIT

2. This affidavit is made in support of a criminal complaint against ROSHAUN NAKIA PORTER ("PORTER"), also known as "Kevin," for a violation of Title 18, United States Code, Section 1589: Forced Labor. The statements contained in this affidavit are based upon my training and experience, information provided to me by other investigators, other law enforcement officers, and witnesses as part of this investigation. This affidavit is intended to show that there is sufficient probable cause for the requested criminal complaint and does not purport to set forth all my knowledge of, or investigation into, this matter.

## III. PROBABLE CAUSE

3. On April 4, 2012, the FBI was contacted by the Santa Ana Police Department ("SAPD") with information regarding an undercover vice sting conducted on April 3, 2012. SAPD informed me that they encountered five females during a prostitution sting. The five females were interviewed individually and each informed SAPD that they were being forced to work as prostitutes by PORTER.

4. SAPD provided the following information to the FBI regarding their interviews

1

on April 3, 2012 of the five females (referred collectively as "VICTIMS"):

    (a) PORTER runs a prostitution ring in the Orange County area.

    (b) PORTER primarily met VICTIMS using internet websites. PORTER placed ads on www.craigslist.com and www.seekingarrangements.com to meet women.

    (c) VICTIMS responded to his ads and began dating PORTER, believing the relationship to be monogamous.

    (d) After PORTER caused VICTIMS to believe he loved them, PORTER convinced them to work as prostitutes selling sex for money.

    (e) VICTIMS have no means to support themselves and rely on PORTER exclusively for their means of living. PORTER promised all VICTIMS that he would rent apartments for them, however he never did.

    (f) VICTIMS mainly live and work out of hotels in Orange County.

    (g) VICTIMS work selling sex, charging $100 for 15 minutes, $150 for 30 minutes, and between $200-$300 for 60 minutes.

    (h) VICTIMS gave all money made to PORTER. PORTER paid for their food and hotels.

    (i) PORTER threatened VICTIMS by telling them if they tried to leave that PORTER would find them and would hurt their families. PORTER also told VICTIMS that he is friends with the police and he will always be able to find VICTIMS if they leave.

    (j) PORTER sometimes used physical violence to control some VICTIMS.

    (k) VICTIMS are afraid of PORTER and believe his threats of harm.

    (l) Two VICTIMS reported to SAPD detectives that they tried to run away

from PORTER, and PORTER threatened the victims via text message and phone calls that he would find them and he threatened to kill JD1's child. When JD1 returned to PORTER, he slapped JD1 in the face and told JD1 that he would kill her family if she ever left again.

(m) VICTIMS stayed with PORTER out of fear.

5. Immediately after VICTIMS were identified and rescued by SAPD on April 3, 2012, PORTER and his associates made continuous attempts to contact all VICTIMS on their cellular phones via text message or telephone calls. SAPD detectives witnessed each of the VICTIMS' cellular phones ringing on the evening of April 3, 2012 and that the VICTIMS were each being called from a cellular phone number (310) 560-4656 (subsequently identified as PORTER's cell phone number).

6. On April 3, 2012 through April 6, 2012, the FBI and SAPD conducted several interviews of JD2 and learned that JD2 made and retained recordings of PORTER making threats to the VICTIMS. On April 5, 2012, I listened to the recordings provided by JD2. During one recorded conversations made by JD2 during the month of March 2012, PORTER can be heard talking on the telephone with a VICTIM named JD3 who had just escaped from PORTER and told PORTER that she was going to report him to the police. PORTER can be heard on the recording threatening JD3 as follows: "You put yourself in a bad situation... I'm tough on you because you need it... I dare you to fuck with me... You think I give a fuck about that? I'm such a real nigger. You listen to me. I'm a real nigger. I fuck with real niggers. I know everything about you. I know where your mama's staying.... You try me. Try me... My boys know who you are, they know what you look like."

7. In a second March 2012 recording made by JD2, PORTER addresses JD4 during

3

a hour long conversation after JD4 complained that she had been working for 90 days and was not getting paid for her work. During that conversation, PORTER can be heard making the following admissions of pimping and threats toward JD4:

    a.    "I field my hustle for you to work at least $1,000 a day. So how much did you make today? How much you make? $680? That means you owe me $340... because my time is money."

    b.    "You talkin' too much you gonna make me go off. I don't give a fuck about you or your friends... I run this motherfuckin' show."

    c.    PORTER asks JD2 how long she "sat in the motherfucking hotel, say it. Working your ass off when you first started?" JD2 answers: "90 days." PORTER asks JD2 whether she went out or did anything during that time. JD2 replies "no."

    d.    PORTER states that he feeds her, drives her around, worries about her. "If some motherfucker come in here and try to hurt you, who will come in here and save you? Cause if you get 50%, I'm not comin' in. The motherfucker try to hurt you, I'm not coming in. I expect you to handle 50% of your ass in that motherfuckin situation... Fuck 50% I don't want no bitch with me that want 50%!"

    e.    "It's a billion people on this planet. But there's one nigger I don't want you to talk crazy to, and that's me."

    f.    JD4 tells PORTER that she does not feel she gets the same benefits as the other VICTIMS. PORTER can be heard explaining that the other VICTIMS have been with him longer. But "nobody puts as much work as me in." PORTER states he takes JD4 to buy nice things and he never did that for JD2 or JD5 when they first started working for him.

      g.     PORTER tells JD4 "you gotta prove that you down for me. 90 days don't prove shit to me… you're the new girl. Don't forget it. You've only been here 90 days."

    8.     On April 4-6, 2012, FBI Special Agents Tricia Whitehill, Randy Gonzalez and Tamara McKen and SAPD Detective John Holcomb conducted interviews with JD2. JD2 provided agents with the following additional information:

      a.     JD2 is from Bulgaria. She came to the United States in August 2009 on a student visa. JD2 currently attends National University.

      b.     JD2 met PORTER on www.craigslist.com in the advertisements for "men seeking women" in approximately January, 2010. JD2 and PORTER dated for approximately four or five months before he suggested to her that she work as an escort because she had been complaining about not having any money. PORTER told JD2 that he had done that work before and knew everything about the business and he would help her. The first time PORTER mentioned that work to JD2, she ignored him. JD2 had never done that kind of work before.

      c.     Beginning in approximately May 2010, PORTER arranged for JD2 to have an escort date with a man, which involved only dinner, not sex. PORTER told JD2 how to conduct herself. PORTER drove JD2 to the date and picked her up from the date. When PORTER picked JD2 up from the date, he told JD2 to give him the $500 she was paid by the man. PORTER took the $500 and returned approximately $50 or $70 to JD2.

      d.     Approximately one week after JD2's dinner date, PORTER took JD2 to a Motel 6 and took photos of JD2 and posted them on www.craigslist.com. "Johns" (a prostitute's client) would respond to the advertisement and PORTER would tell JD2 how to speak to the johns on the phone and how to conduct herself. PORTER changed his demeanor toward JD2 and

5

became threatening and mean. He would yell at her and threaten to take her things and leave her. They stayed at the Motel 6 for twenty days. JD2 did not leave the hotel during that time. JD2 had clients every day, with no days off. PORTER would listen to the dates by having JD2 call PORTER's cellular phone from the hotel phone to make sure she was safe but also to ensure that he could trust her. PORTER decided how much to charge the clients.

  e. After one week, JD2 told PORTER that she did not want to do that work. JD2 was scared of PORTER as his tenor had changed and was acting mean towards her. JD2 felt dependent on PORTER and was scared and intimidated.

  f. PORTER started adding women to his prostitution business. JD2 was jealous of the other women and was worried about the situation. PORTER started treating her worse, threatening her more often. PORTER threatened to tell her family in Bulgaria and send her naked photographs to them.

  g. In December 2011, JD2 tried to run away. PORTER threatened her by text messages and telephone that he would have his police friends find her. JD2 told him where she was staying. PORTER came and forced her to leave with him. PORTER took JD2 to an associate's house named K.M. K.M. kept watch over JD2 for approximately two weeks. PORTER took JD2's phones, money, identification cards and passport away. PORTER told JD2 she would have to stay at K.M.'s home until JD2 earned his trust back. Thereafter, JD2 was allowed to travel to Bulgaria for the holidays. PORTER warned JD2 that she must return or else PORTER would send naked photos of JD2 to her family and find her.

  h. PORTER was sometimes physically abusive towards the VICTIMS. JD2

personally witnessed PORTER hit JD1. JD1 witnessed PORTER hit JD2 and throw JD2 to the floor. PORTER told JD2 how he choked a former victim named "Maria."

  i. PORTER watched www.YouTube.com instructional videos on how to be a pimp. PORTER also owned books and videos on pimping.

  j. PORTER was concerned that the prostitution business would be discovered by law enforcement and instructed the VICTIMS not to use words such as "condom" or "client" or any other vocabulary that would be indicative of the prostitution business when talking on the phone.

  k. PORTER told the VICTIMS that if they were ever arrested they should say they do that work willingly on their own terms without a pimp.

  l. PORTER operated his prostitution business in a clandestine manner. The hotel rooms were booked using JD2's credit cards. His vehicles were registered in other peoples' names. PORTER did not have a residence linked to him. He paid for everything in cash.

  9. After the SAPD vice sting, SAPD detectives downloaded text messages from two VICTIMS' cellular phones. A review of those text messages show the level of control PORTER had over the VICTIMS. For example, the text messages from PORTER show him dictating to JD2 (his most trusted VICTIM) where to book hotels for the prostitution work, when to post advertisements on www.backpages.com. They also show how PORTER was responsible for taking photographs of the VICTIMS for www.backpages.com advertisements, and that PORTER paid for special cards that he used and caused JD2 to use to post advertisements on that website.

  10. On April 4, 2012, the day after JD2 was rescued by SAPD, JD2 placed multiple

consensually recorded telephone calls to PORTER. During those calls, PORTER made the following statements:

    a.    "You don't want me to come to your school. Trust me. You don't."

    b.    "I don't care about those other girls... call my mom. Ask her. I'm done. I ain't ever gonna do that shit again... I don't wanna do that no more. I was stupid... we ain't ever going back to that."

    c.    When JD2 tried to get PORTER to verbalize how he treated the VICTIMS, PORTER stated: "You keep on talking on the phone. You aren't being a thinker. You cannot talk about that on the phone."

    d.    "Babe, I swear to God, no more lies, no more control... I'm going to be who I really am... I'm not ever going to do it again."

    e.    "I really need to talk to you about what happened and what went on, so we can figure out how to approach this situation."

//
//
//
//
//
//
//
//

## IV. CONCLUSION

11.     Based on the facts set forth herein, and based on my training, education, experience, and participation in this investigation, there is probable cause to believe that ROSHAUN NAKIA PORTER ("PORTER"), also known as "Kevin," violated Title 18, United States Code, Section 1589: Forced Labor.

Tricia Whitehill
Special Agent
Federal Bureau of Investigation

SUBSCRIBED TO AND SWORN BEFORE ME
THIS 10th DAY OF APRIL 2012

**JEAN P. ROSENBLUTH**

UNITED STATES MAGISTRATE JUDGE